OSCAR MAYER FOODS
CORPORATION,
Appellant,

v.

Debbie TASLER, Appellee.

No. 90–1650.

Supreme Court of Iowa.

April 15, 1992.

Harry W. Dahl, Des Moines, for appellant.

Wayne H. McKinney, Jr. of McKinney Law Offices, P.C., Waukee, for appellee.

Considered by HARRIS, P.J., and LARSON, LAVORATO, NEUMAN, and SNELL, JJ.

SNELL, Justice.

Appellee, Debbie Tasler, seeks review of a court of appeals decision that reversed an award of workers' compensation pursuant to Iowa Code chapter 85. Tasler filed five separate petitions with the Industrial Commissioner, each seeking compensation for injuries allegedly sustained during the course of her employment with appellant, Oscar Mayer Foods Corporation. The five petitions were consolidated and considered in an arbitration hearing wherein the Commissioner concluded that, although none of the five injuries constituted a compensable disability when considered separately, together the five injuries constituted a "cumulative, repetitive, overuse type of injury," for which workers' compensation was due. Accordingly, the Industrial Commissioner found that Tasler had sustained a fifteen percent permanent-partial industrial disability entitling her to seventy-five weeks of disability benefits at the rate of $271.76 per week for a total amount of $20,382. Oscar Mayer appealed this decision to the district court, which affirmed the Commissioner's final order. The court of appeals reversed the decision of the district court. We granted review and now vacate the decision of the court of appeals and reinstate the district court's affirmance of the Commissioner's decision.

Our review is under the provisions of chapter 17A Administrative Procedure Act, section 17A.19(8)(e) and (f).

The facts are in all material respects undisputed. Tasler began work for Oscar Mayer on September 3, 1983, and lost her employment on February 3, 1989, when the plant was permanently closed. Her pre-

employment physical examination was normal and, consequently, Tasler began work on Oscar Mayer's production line under no restrictions. Tasler's initial position was that of ham boner, which lasted approximately one year; in September of 1984, she became a bandsaw operator, which involved dismembering hogs at the rate of approximately 700 to 900 animals per hour.

Oscar Mayer plant medical records indicate that Tasler was treated several times in 1983 and 1984 for persistent discomfort in her fingers, thumbs, hands, wrists, elbows, shoulders, and arms as well as back pain. However, Tasler alleges her first injury occurred on April 30, 1985, while working on the bandsaw. Because of an apparently improper servicing of her bandsaw, Tasler, in the course of reaching for a piece of meat, lost her footing and dropped about two feet until her right arm struck a metal bar. She reported hearing a "snap-crackling sound" in her right shoulder and notified her superiors of the incident. As a consequence of this mishap, Tasler consulted two physicians, one of whom was an orthopedic surgeon. She was then permanently restricted from operating the bandsaw as of April 30, 1985.

After the bandsaw incident, Tasler continued under the care of Dr. Arnis Grundberg, the orthopedic surgeon whom she had consulted immediately after the injury. Tasler reported to Grundberg that she was and had been experiencing discomfort and numbness in her upper extremities and back region even prior to the incident on April 30, 1985. Dr. Grundberg diagnosed Tasler as having "thoracic outlet syndrome" and "ulnar nerve irritation with gradual onset." Dr. Grundberg made no mention of any permanent injury and gave no impairment rating.

Tasler's second alleged injury occurred on August 24, 1986, after she had been transferred to a new position that required her to skin hams at the rate of 500 to 700 per hour. During the course of skinning the hams, which weigh between seventeen and thirty-five pounds each, she testified that an "unbearable pain" developed in her neck, shoulders, arms, and right hand.

Tasler indicated that the pain was so intense that she was literally "working in tears" and had to be relieved periodically by coworkers. As a consequence, Oscar Mayer sent her to see Kurt J. Klise, M.D. Tasler saw Dr. Klise several times over the next two months, and he ultimately diagnosed her as suffering from "muscle strain injury" and "right trapezius muscle spasm." In a later visit, Tasler complained to Dr. Klise of paresthesia in her hands and wrists, and as a result, she was referred to Dr. Douglas W. Brenton, M.D., a neurologist, for a neurologic assessment. Dr. Brenton issued a consistent diagnosis of "musculoskeletal pain syndrome secondary to hard manual labor." Dr. Brenton recommended that Tasler be reassigned to a different job that would not require such "repetitive and vigorous upper extremity work." Neither Dr. Klise nor Dr. Brenton mentioned permanent impairment or gave an impairment rating.

At the time of Tasler's third alleged injury on April 11, 1987, she was again skinning hams. As was the case in the second alleged injury, Tasler reported an "unbearably intense pain in her neck, shoulder, right arm, hand, and fingers." Again, she sought the care of Dr. Klise. Dr. Klise diagnosed her as suffering from "trigger finger" and restricted her to "light duty" for the next six days.

Tasler's fourth alleged injury occurred on February 16, 1988, while she was working on the "bellyline." Tasler testified that as she reached across the line to remove a bone from a section of meat, a muscle in her left lower back "tightened up." After this incident, Tasler consulted Dr. Steven Sohn who diagnosed her as having "muscle strain of the left lumbar region." As was the case with each of the three prior alleged injuries, Tasler did not lose any time from work on account of the February 16 incident.

During the course of Tasler's tenure at Oscar Mayer, she also repeatedly sought the counsel of her personal physician, Dr. Dennis Rolek, D.O., Ph.D. On July 11, 1988, Dr. Rolek attributed Tasler's multiple complaints of pain and numbness as being

due to "occupational injury or illness." His formal diagnosis was: "Bilateral thoracic outlet syndrome, cervical spine strain, lumbar spine strain and tension cephalgia." At that time, he also assigned an impairment rating of twenty-eight percent, twelve percent being attributable to her low back problems and sixteen percent associated with her upper extremities and neck.

Dr. Rolek referred Tasler to S. Randy Winston, M.D., a neurosurgeon, for an evaluation. Dr. Winston diagnosed Tasler as suffering from "myofascitis and probably bilateral thoracic outlet syndrome." Dr. Winston urged Tasler to consider some type of change in her job since her employment "obviously [was] aggravating [her] condition."

Tasler was also examined on two occasions by Peter D. Wirtz, M.D., at the request of Oscar Mayer. Dr. Wirtz diagnosed Tasler as having various muscle strains, bilateral vascular thoracic outlet syndrome, and Achilles tendinitis. Dr. Wirtz indicated that none of her conditions were permanent in nature but stated that "if she continues to work beyond her physiologic capabilities, she will continue to exhibit these symptoms."

Finally, it should be noted that Tasler's plant medical records reveal a voluminous history of complaints dating back to November 23, 1983, just over two months after the inception of her employment. More specifically, the record contains over 125 entries made during the course of Tasler's five-and-one-half-year employment with Oscar Mayer. The company records also indicate that Tasler was placed on "fifty percent duty" on multiple occasions. At the time of the plant closing on February 3, 1989, Tasler was restricted by Dr. Sohn to a fifteen-minute break every hour and limited to lifting no more than fifteen pounds.

At the arbitration hearing, Tasler testified that since the plant closing, she has continued to experience back, neck, arm, hand and finger pain as well as numbness. She indicated that the pain has become progressively worse and now precludes her from engaging in various routine tasks, including driving, food preparation, and personal grooming activities.

Based on the foregoing evidence, the Industrial Commissioner found that, although Tasler failed to demonstrate a compensable injury on any one of the four dates alleged in her petitions, Tasler had demonstrated by a preponderance of the evidence that she had sustained a "cumulative, repetitive, overuse type of injury to her neck, shoulders, arms, elbows, wrists, hands, fingers, and back" in the course of performing her duties for Oscar Mayer. *See McKeever Custom Cabinets v. Smith*, 379 N.W.2d 368, 374 (Iowa 1985) (recognizing cumulative injury as a viable theory of recovery under the workers' compensation code). The Commissioner's opinion noted that Tasler's complaints and the company medical record were corroborated by the various physicians involved who generally concurred in a diagnosis of muscle strain injuries to the neck, back and upper extremities as well as bilateral thoracic outlet syndrome.

The Commissioner further found that Tasler's cumulative injury constituted an "industrial disability," which the Commissioner acknowledged as involving a "loss of earning capacity and not a mere functional disability." *Diederich v. Tri–City Ry.*, 219 Iowa 587, 593, 258 N.W. 899, 902 (1935). The Commissioner reasoned as follows:

> The direct and immediate conclusion to be drawn from the reports of Dr. Rolek, Dr. Winston, Dr. Brenton, and Dr. Wirtz, is that claimant should no longer continue to perform production line work in the meat packing industry. Therefore, the work she has performed for the five and one-half years with employer is foreclosed to her as a practical matter even though the physicians did not formally state that claimant is permanently restricted from this kind of work. Continuing to work would require more physical therapy, medications, wrapping of the wrists and trips to the doctor. Dr. Rolek said her condition would become worse. The other doctors, Dr. Brenton, Dr. Winston and Dr. Wirtz imply the same.

Accordingly, after considering the impairment ratings offered by Dr. Rolek (twenty-eight percent) and Dr. Wirtz (zero percent) as well as the fact that Tasler, currently thirty-one years of age, is actively seeking retraining with the help of government aid, the Commissioner ultimately concluded that she had suffered a "fifteen percent permanent industrial disability to the body as a whole based on the cumulative job injury to her neck, shoulders, arms, elbows, wrists, hands, fingers, and lower back during her five and one-half years of employment with [Oscar Mayer] performing repetitive work with her upper extremities and her back."

The Commissioner chose February 3, 1989, the date on which the plant was closed, as the date of injury for Tasler's case. The fifteen percent disability was based upon her salary as of February 16, 1988, which was the last date on which Tasler alleged she had sustained a compensable injury. The parties had stipulated that Tasler's rate of compensation on February 16, 1988, was $271.76 per week.

Oscar Mayer challenges the decision of the Industrial Commissioner on essentially three grounds. First, Oscar Mayer maintains that Tasler did not base her claims for recovery on the cumulative injury rule, but instead sought a separate recovery for each of the four traumatic injuries alleged. As a consequence, Oscar Mayer complains that it was prejudiced in its ability to maintain an adequate defense given that the Commissioner's rationale for allowing Tasler compensation was based on the cumulative injury rule. In its second asserted error, Oscar Mayer contends that the Industrial Commissioner's determination that Tasler's injury date was February 3, 1989, was improper since Tasler neither quit her job nor sought medical assistance on that date. Finally, Oscar Mayer argues that the Commissioner's assessment of a fifteen percent industrial disability was not supported by substantial evidence.

## I. *Notice to Oscar Mayer of a Cumulative Injury.*

■ We have observed that with respect to agency adjudications, due process requires that a party "be informed somehow of the issue involved in order to prevent surprise at the hearing and allow an opportunity to prepare.... The test is fundamental fairness, not whether the notice meets technical rules of common law pleading." *Wedergren v. Board of Directors,* 307 N.W.2d 12, 16 (Iowa 1981). *See also Coghlan v. Quinn Wire & Iron Works,* 164 N.W.2d 848, 850 (Iowa 1969) ("An application for arbitration is not a formal pleading and is not to be judged by the technical rules of pleading."). In Tasler's petition for arbitration, dated August 24, 1986, she attributed the cause of her injury to "gradual injury from skinning hams." Again, in her petition dated July 26, 1987, Tasler alleged an injury arising from "repetitive use and strain of back during course of employment." Based on these excerpts from the petitions filed with the Industrial Commissioner, we conclude that Oscar Mayer was sufficiently apprised of the possibility that the cumulative injury doctrine might be relied upon to justify awarding Tasler workers' compensation.

Moreover, it is not clear how Oscar Mayer has been prejudiced by the allegedly deficient pleading as Tasler's essential cause of action as well as the supporting facts remain unchanged under a cumulative injury rationale. A showing of prejudice is essential to establishing a due process violation given that the touchstone of due process is "fundamental fairness." *Wedergren,* 307 N.W.2d at 16; *cf. Coghlan,* 164 N.W.2d at 851 ("It is fundamental, even where the rules of pleading apply, that a variance between pleading and proof is immaterial unless the complaining party establishes that he was thereby misled to his prejudice in maintaining his cause of action or defense.").

## II. *Effect of Plant Closing.*

■ Oscar Mayer next contends that Tasler is barred from receiving any workers' compensation benefits as a matter of law because she continued to work until the plant closed, despite the injuries now claimed. Our case of *McKeever Custom*

*Cabinets v. Smith*, 379 N.W.2d 368 (Iowa 1985), is cited as requiring an employee to have missed work because of injury in order to establish eligibility for benefits. The court of appeals reversed the district court on this point.

The relevant issue in *McKeever* related to an interpretation of the two-year statute of limitations contained in chapter 85 of the code on workers' compensation. Section 85.26(1) provides: "No original proceeding for benefits under this chapter ... shall be maintained in any contested case unless such proceeding shall be commenced within two years from the date of the occurrence of the injury for which benefits are claimed...." The question in *McKeever* concerned the meaning of "date of the occurrence of the injury" for application of the statute of limitations. We chose between an interpretation that fixed the date of injury "when pain prevented the employee from continuing to work" and one that fixed it "when the pain occasions the need for medical attention." We said: "We incline toward the former of these alternatives; clearly the employee is disabled and injured when, because of pain or physical inability, he can no longer work."

Applying this interpretation, we held that the employee was not barred by section 85.26(1) because the injury occurred for time limitation purposes, when he gave up his job and that the two-year statute of limitations then began to run. This holding was limited to the question of computing the time for limitation purposes under section 85.26(1). It sets no requirements of proof in cumulative injury cases, otherwise, particularly when the employee, as here, would be foreclosed from any showing by the fortuitous circumstance of the plant's closing.

### III. *The Date of Injury Under the Cumulative Injury Rule.*

■ Oscar Mayer contends that the Industrial Commissioner's determination of an injury date of February 3, 1989, the date the Oscar Mayer plant permanently closed, was incorrect. In support of this position, Oscar Mayer again relies on *McKeever* for the proposition that since Tasler was not injured on February 3, 1989, and did not miss work on that day, her proof of injury failed. Reliance on *McKeever* is again in error.

■ The date of injury is an important determination given that "a number of important questions cannot be answered unless a date of injury or accident is fixed, such as which employer and carrier is on the risk, whether notice of injury and claim are within the statutory period, whether statutory amendments were in effect, which wage basis applies, and many others." 1B A. Larson, *Workers' Compensation* § 39.10 (1991) [hereinafter Larson]. Consistent with a liberal construction of the workers' compensation statute, *Orr v. Lewis Cent. Sch. Dist.*, 298 N.W.2d 256, 261 (Iowa 1980), we believe that for purposes of computing benefits it is appropriate to fix the date of injury as of the time at which the "disability manifests itself." Larson at § 39.50; *Bellwood Nursing Home v. Industrial Comm'n*, 115 Ill.2d 524, 106 Ill.Dec. 235, 238, 505 N.E.2d 1026, 1029 (1987). "Manifestation" is best characterized as "the date on which both the fact of the injury and the causal relationship of the injury to the claimant's employment would have become plainly apparent to a reasonable person." *Bellwood*, 106 Ill.Dec. at 238, 505 N.E.2d at 1029.

■ The Commissioner is entitled to a substantial amount of latitude in making a determination regarding the date of manifestation since this is an inherently fact-based determination. *See Mercy Health Ctr. v. State Health Facilities*, 360 N.W.2d 808, 809 (Iowa 1985) (Cardinal rule of administrative law is that judgment calls are province of administrative tribunal, not the court's.). We thus reject an interpretation of the term "manifestation" that will always require an employee suffering from a repetitive-trauma injury to fix, as the date of accident, the time at which the employee first became aware of the physical condition, presumably through medical consultation, since by their very nature, repetitive-trauma injuries often will take years to develop to the point where they will consti-

tute a compensable workers' compensation injury. *See Oscar Mayer & Co. v. Industrial Comm'n*, 176 Ill.App.3d 607, 126 Ill. Dec. 41, 43, 531 N.E.2d 174, 176 (1988). Instead, the Commissioner is entitled to consider a multitude of factors such as absence from work because of inability to perform, the point at which medical care is received, or others, none of which is necessarily dispositive.

Thus, for purposes of the cumulative injury rule, the Commissioner's determination regarding the date on which the injury manifests itself, so long as supported by substantial evidence as is required by Iowa Code section 17A.19(8)(f), will not be disturbed on appeal. Our review of the record leads us to conclude that there is substantial support for the Commissioner's determination that the various traumas Tasler sustained in the course of her five and one-half years with Oscar Mayer combined to manifest themselves as a single compensable injury on February 3, 1989. Accordingly, the date of injury established by the Commissioner was proper.

IV. *Earnings Calculation.*

■ In a related argument, Oscar Mayer argues that, even if February 3, 1989, is the date on which Tasler's cumulative injury manifested itself, the Commissioner improperly based the disability calculation on earnings as of February 6, 1988. February 6, 1988, was the last date of traumatic injury alleged in the petitions submitted to the Industrial Commissioner by Tasler. Oscar Mayer and Tasler stipulated that her earnings as of February 6, 1988, were $271.76 per week.

Iowa Code section 85.36 provides that "[t]he basis of compensation shall be the weekly earnings of the injured employee at the time of the injury." The Commissioner apparently concluded that Tasler's earnings as of February 6, 1988, remained constant through the date of injury, February 3, 1989. Since no evidence was offered by Oscar Mayer to rebut this reasonable presumption, we are persuaded that this inference is supported by substantial evidence. *See Mercy Health Ctr.*, 360 N.W.2d at 811–

12 (evidence is substantial if reasonable person would find it adequate to reach given conclusion).

V. *Substantial Evidence Supporting the Fifteen Percent Industrial Disability Determination.*

■ In their final challenge to the Industrial Commissioner's determination, Oscar Mayer argues that the Commissioner's assessment of a fifteen percent industrial disability was not supported by substantial evidence. More specifically, Oscar Mayer argues that because Tasler continued to work, even accepting overtime when available, and thus suffered no actual diminution in earning capacity as of the date the plant was closed, Tasler cannot be deemed to have suffered an industrial disability. In further support of their assertion, Oscar Mayer notes that Tasler is currently enrolled in a two-year executive assistant's course at Des Moines Area Community College and, therefore, may be well on her way to earning more than she did as a production line worker with Oscar Mayer.

■ Our task, pursuant to Iowa Code section 17A.19(8)(f), is to ensure that the Commissioner's actions were supported by substantial evidence in the record when that record is viewed as a whole. Evidence is substantial if a reasonable person would find it adequate for reaching a conclusion, even though a reviewing court might reach a contrary inference. *Mercy Health Ctr.*, 360 N.W.2d at 811–12. The mere possibility that the record might support another conclusion does not permit the reviewing court to make a finding inconsistent with the agency finding so long as there is substantial evidence to support it. *City of Davenport v. PERB*, 264 N.W.2d 307, 311 (Iowa 1978).

However, prior to making the above evidentiary determination, the legal criteria on which a determination of industrial disability rests must first be considered. In *Diederich v. Tri–City Railway*, 219 Iowa 587, 258 N.W. 899 (1935), we stated that the term "disability" for purposes of the workers' compensation statute means " 'industrial disability' or loss of earning capacity

and not a mere 'functional disability' to be computed in terms of percentages of the total physical and mental ability of a normal man." *Diederich*, 219 Iowa at 593, 258 N.W. at 902. "In determining [the extent of an employee's] industrial disability, consideration may be given to the injured employee's age, education, qualifications, experience and his inability, because of the injury, to engage in employment for which he is fitted." *Olson v. Goodyear Serv. Stores*, 255 Iowa 1112, 1121, 125 N.W.2d 251, 257 (1963); *see also Gallardo v. Firestone Tire & Rubber Co.*, 482 N.W.2d 393 (Iowa 1992). If the evidence relating to these criteria is substantial when the record is viewed as a whole, the Commissioner's decision must be sustained.

The record compiled before the Commissioner in the instant case indicates that Tasler was permanently restricted from operating the bandsaw as of April 30, 1985. In addition, at the time of the plant closing, Dr. Sohn had instructed Tasler to refrain from bending, stooping, or lifting over fifteen pounds; he also required her to take a fifteen-minute break every hour. Several of the physicians consulted by Tasler indicated that if she did not obtain a less physically demanding job, no abatement in her symptomatology could be expected. Finally, Dr. Rolek stated that Tasler had sustained a twenty-eight percent physical impairment as a consequence of her work with Oscar Mayer.

The evidence also suggests that Tasler is young enough to be retrained and in fact is actively seeking retraining with the help of government aid. As the Commissioner properly notes, this is an appropriate consideration in determining the degree of industrial disability. However, it is important to remember that any benefits that might accrue from Tasler's efforts to secure further skills are speculative and, therefore, should not be regarded as dispositive on the issue of whether she has suffered a loss of earning capacity.

Based on the foregoing evidence, we conclude that the Commissioner's determination that Tasler is, as a practical matter, permanently foreclosed from engaging in physically intensive labor of the sort she was accustomed to in the course of her employment with Oscar Mayer is supported by substantial evidence. Based upon the generally consistent diagnoses offered by the various physicians, Tasler's testimony, and the restrictions imposed on Tasler as of the time of the plant closing, it is certainly reasonable to conclude that Tasler has sustained a fifteen percent loss of earning capacity.

Oscar Mayer, nevertheless, urges us to adopt a definition of disability that would require an actual diminution in earning capacity as of time of injury. As we have noted above, the Commissioner is entitled to draw reasonable inferences based upon the evidence presented and thus conclude that Tasler is currently foreclosed from full participation in manual labor of the sort she was accustomed to while in the employ of Oscar Mayer. Thus, it can be said that Tasler has suffered a loss of earning capacity even though she did not suffer an actual diminution in her earnings while in the employ of Oscar Mayer.

■ Requiring a claimant to also demonstrate an actual diminution in earnings would place a premium on missing work—often unnecessarily—merely to establish an actual diminution in earnings and thereby penalize devoted employees who faithfully perform job duties despite bodily discomfort and damage. *See Bellwood Nursing Home*, 106 Ill.Dec. at 237, 505 N.E.2d at 1028. This is not to say, however, that an actual diminution in earnings is unimportant in establishing an industrial disability; we only decide that in this age of insidious work place injuries, compensable disabilities will often be present despite the fact that the employee has not, as yet, suffered any actual diminution in earning capacity. Thus, a showing of actual diminution in earnings will not always be necessary to demonstrate an injury-induced reduction in earning capacity.

The decision of the court of appeals is vacated, and the district court judgment is affirmed.

DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.